UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X
THE PEOPLE OF THE STATE OF NEW YORK by
LETITIA JAMES, Attorney General of the State of New
York,

                                       Plaintiff,

                  -against-

UNITED PARCEL SERVICE, INC.,

                                    Defendant.
------------------------------------------------------------------------ X

**Case No. 1:26-cv-00341-VSB**

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, the People of the State of New York, by Letitia James, Attorney General of the State of New York (the "Attorney General"), respectfully alleges:

## **INTRODUCTION**

1. The Attorney General brings this action on behalf of the People of the State of New York pursuant to New York Executive Law § 63(12) against Defendant United Parcel Service, Inc. ("UPS") to enjoin UPS from conducting its business in violation of the New York Labor Law, Art. 19, §§ 650 *et seq.* ("NYLL"), and the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201, *et seq.* ("FLSA"), and to apply for relief for UPS's failure to pay minimum wage, promised wages, and overtime wages for all hours worked and failure to comply with the NYLL's notice and recordkeeping requirements.

2. UPS is a multinational package delivery company that bills itself as providing shipping and logistics solutions at a global scale. According to its website, UPS is the world's largest package delivery company, and in 2024, UPS shipped an average of 22.4 million packages every day, for a total of 5.7 billion packages that year. Yet despite its size, resources, and

presumable skill at managing logistics, UPS persistently underpays seasonal workers, a particularly vulnerable group.

3.    During peak season, running from October to January, UPS hires thousands of temporary workers in at least 55 facilities across New York State.

4.    Two types of seasonal workers assist directly with package delivery: (1) Driver Helpers accompany Drivers of UPS trucks to help the Drivers deliver packages; and (2) Seasonal Support Drivers (formerly Personal Vehicle Drivers) use their personal vehicles to make deliveries. Driver Helpers and Seasonal Support Drivers (referred collectively hereinafter as "Seasonal Delivery Workers") typically report to work by either arriving at a UPS warehouse or meeting a Driver in the field.

5.    Each year, UPS commits wage theft against these workers in myriad ways.

6.    UPS has repeatedly and persistently failed to pay Seasonal Delivery Workers for all time worked in accordance with the requirements of state and federal law. Seasonal Delivery Workers have worked off-the-clock before the beginning of the shift, after the ending of the shift, and at various other times, including at the beginning and end of employment, between shifts, and during meal breaks. Additionally, UPS's timekeeping practices and edits to records have introduced and compounded timekeeping errors.

7.    ***First***, UPS has repeatedly and persistently failed to pay Seasonal Delivery Workers for work performed at the beginning of their shifts. UPS fails to keep accurate records of their work time, which leads to Driver Helpers and Seasonal Support Drivers performing unpaid work for UPS before they clock in. For example, workers report showing up in the field and waiting to clock in; others are made to wait at a facility before clocking in, sometimes for hours, as trucks are loaded.

8.      ***Second***, UPS has repeatedly and persistently failed to pay Seasonal Delivery Workers for work performed at the end of their shifts. UPS fails to keep accurate records of their work time, which leads to Driver Helpers and Seasonal Support Drivers performing unpaid work for UPS after they clock out. UPS tells some workers in the field to return work-related items to UPS facilities after they are clocked out for the day. Some workers are even asked to work for *hours* off the clock in the evening.

9.      ***Third***, UPS has repeatedly and persistently failed to pay Seasonal Delivery Workers for work performed at various other times, including for training, between shifts, on days they are not ultimately assigned a shift, during their unpaid meal breaks, and while returning devices at the end of their employment. Workers have reported not being paid for time spent watching training videos, traveling between meet-up points, and performing work during their supposed lunch period, among other things.

10.      ***Fourth***, UPS's timekeeping practices under-record Seasonal Delivery Workers' compensable hours. Not only does UPS have its Seasonal Delivery Workers working off the clock; it also makes assumptions in favor of undercounting compensable time. UPS even edits timekeeping to reduce compensable hours.

11.      These practices have resulted in UPS repeatedly and persistently failing to pay Seasonal Delivery Workers for all time worked. Additionally, these practices have led UPS to repeatedly and persistently fail to pay overtime, fail to keep accurate payroll records, and fail to provide these workers with accurate wage statements.

12.      UPS prides itself on its sophistication in on-time delivery and logistics. But UPS has chosen not to apply this same sophistication to ensure that it accurately records and

compensates its workers' time. In doing so, UPS has willfully violated the state and federal wage rights of workers who rely on seasonal labor to make their living.

## JURISDICTION AND VENUE

13.     Plaintiff initially filed the Complaint in this action in New York State Supreme Court on December 15, 2025. Defendant filed a Notice of Removal in this Court on January 14, 2026, asserting subject matter jurisdiction based on federal question jurisdiction under 28 U.S.C. §§ 1331, 1367(a), and 29 U.S.C. § 185, and diversity of citizenship under 28 U.S.C. § 1332. The parties filed a stipulation, which the Court endorsed on January 27, 2026, wherein Plaintiff agreed not to contest the Court's jurisdiction over the claims asserted in the Complaint and Defendant agreed not to challenge the Court's exercise of supplemental jurisdiction over any state law claims.

14.     Plaintiff does not dispute that venue is proper under 28 U.S.C. § 1441(a) because the action was removed from state court to this Court.

## PARTIES

15.     Plaintiff is the Attorney General of the State of New York and is empowered to seek, on behalf of the People of the State of New York, injunctive relief, restitution, and damages for repeated and persistent fraud or illegality in the transaction of business in the State of New York. Plaintiff brings this action on behalf of the People of the State of New York.

16.     The Attorney General has a principal place of business at 28 Liberty Street, New York, New York, 10005.

17.     Defendant UPS is an Ohio corporation that employs Seasonal Delivery Workers in New York. At all relevant times, UPS transacted and conducted substantial business in the state of New York.

**FACTUAL ALLEGATIONS**

**I.      UPS Employs Seasonal Delivery Workers at Facilities Throughout the State.**

18.      Each year, UPS hires thousands of Seasonal Delivery Workers in New York on a temporary basis between October and January to address a seasonal increase in demand.

19.      UPS hires Driver Helpers to accompany Drivers of UPS trucks to help the Drivers deliver packages.

20.      UPS hires Seasonal Support Drivers to use their own vehicles to deliver packages.

21.      UPS communicates rates of pay to Seasonal Delivery Workers around the time of hire, including through offer letters and other similar documentation provided directly to Seasonal Delivery Workers. Many Seasonal Delivery Workers are promised rates of pay above the applicable state minimum wage. Promised rates of pay vary over time and by location.

22.      Typically, UPS contacts Seasonal Delivery Workers the night before or the morning of the workday to tell them their start time, often by text message or phone.

23.      Some Seasonal Delivery Workers have set schedules.

24.      For many other Seasonal Delivery Workers, the start time can vary from day to day, as can the length of the workday, depending on the volume of deliveries and other conditions.

25.      Seasonal Delivery Workers sometimes work over 40 hours in a week.

26.      At their scheduled start times, Seasonal Delivery Workers report to a designated location, either at a UPS facility or on the package delivery route.

27.      Driver Helpers typically meet a Driver at the UPS facility or on the road to join them in the truck on their route.

28.      Seasonal Support Drivers pick up packages from a Driver along the delivery route or from a facility to deliver separately in their own personal vehicle.

**II.**    **Seasonal Delivery Workers Perform Uncompensated Off-the-Clock Work.**

29.    UPS does not require its facilities to use a particular system to keep time for Seasonal Delivery Workers. Work time has been recorded variously on paper timesheets, a UPS device, or an application on a mobile phone.

30.    Seasonal Delivery Workers often perform work when they are not clocked in and are not paid for this time worked.

*A. Seasonal Delivery Workers clock in after they begin working at the beginning of the shift.*

31.    Seasonal Delivery Workers' wait time, work, and work-related travel at the beginning of the workday has not been accurately recorded by UPS, resulting in work not being counted. This unrecorded work time has not been paid.

i.    Driver Helpers

32.    Driver Helpers typically do not have their own means to clock in. In many instances, Driver Helpers have arrived at the designated meet-up location at their scheduled start time but have had to wait for Drivers at some point along the Driver's route. Many Driver Helpers rely on the Driver to record their time on a paper timesheet, on a Delivery Information Acquisition Device (DIAD), or on a mobile application. Drivers frequently do not arrive at the designated meet-up location at the Driver Helper's scheduled start time.

33.    Driver Helpers who report to a facility at the start of their shifts have had to wait to be assigned a Driver, to wait for a Driver to leave the facility, or to commute from a facility to a designated location along the delivery route before clocking in.

34.    Whether they are meeting a Driver along a delivery route or are reporting to a facility, many Driver Helpers have had to wait until a driver picks them up, the first package is scanned to register delivery, or the first package is delivered before clocking in.  This has resulted

in unpaid work time between the scheduled start time and the time that the Driver actually clocks in the Driver Helper.

35.     Because of these practices, the time that Driver Helpers spend waiting for their Driver, working, or traveling after their scheduled start time begins is not consistently recorded, resulting in underpayment of wages.

ii.  Seasonal Support Drivers

36.     Seasonal Support Drivers clock in on a UPS device or mobile phone that UPS provides to them after receiving packages from a Driver or from a UPS facility.

37.     Seasonal Support Drivers who meet up with a Driver along a delivery route have had to wait until the Driver arrives with packages to clock in. Drivers frequently have not arrived at the designated meet-up location at the Seasonal Support Driver's scheduled start time. Further, Seasonal Support Drivers frequently cannot clock in until they load packages onto their vehicle.

38.     Seasonal Support Drivers who report to a facility to receive packages at the start of their shifts have had to wait for trucks to leave the facility, to wait for packages to be unloaded, or to commute from a facility to a designated location along the delivery route before clocking in.

39.     For example, one worker was asked by UPS to arrive at a facility between 8:00 and 8:30 a.m., but they were not allowed to clock in until after they loaded their car with UPS packages. They had to wait until UPS trucks were unloaded, so they would sit for up to an hour in the parking lot wasting gasoline so that they could keep their car warm in the winter cold. Eventually, they were allowed to go inside, but they had to sort their own packages and load them before they could clock in.

40.     Whether they are meeting a Driver or reporting to a facility, Seasonal Support Drivers have had to wait to receive their delivery route, to wait for packages to become available,

to load their vehicle, or to wait until the first package is scanned or delivered before clocking in. For some Seasonal Support Drivers, the ability to clock in may be dependent upon receipt of a trip number or other information that they must wait to obtain from UPS once they have been assigned packages.

41.    Because of these practices, the time that Seasonal Support Drivers spend waiting for their Driver, working, or traveling after their scheduled start time begins is not consistently recorded, resulting in underpayment of wages.

B. *Seasonal Delivery Workers clock out before they finish working at the end of the shift.*

42.    Seasonal Delivery Workers' work or work-related travel at the end of the workday is not accurately recorded by UPS, resulting in work not being counted. This unrecorded work time has not been paid.

   i.   Driver Helpers

43.    Driver Helpers have been instructed by UPS to clock out before returning a work device to a UPS facility or completing the last delivery.

44.    Because of these practices, the time that Driver Helpers spend working after they clock out is not consistently recorded, resulting in underpayment of wages.

   ii.  Seasonal Support Drivers

45.    Seasonal Support Drivers have had to clock out before returning a work device to a UPS facility, returning packages to a UPS facility, or completing the last delivery.

46.    One Seasonal Support Driver reports that they were required to clock out after they delivered their last package, even on occasions on which they had to return undelivered packages to the facility.

47.     Because of these practices, the time that Seasonal Support Drivers spend working after they clock out is not consistently recorded, resulting in underpayment of wages.

C. *Seasonal Delivery Workers perform other work off-the-clock.*

i. Driver Helpers

48.     Driver Helpers also have performed other work off-the-clock, including training, waiting for assignment to a Driver without ultimately being assigned, traveling between locations when assigned to work with a second Driver, returning to the warehouse to do additional work, and returning equipment after their last day of employment.

49.      The time that Driver Helpers spend working off-the-clock is not consistently recorded, resulting in underpayment of wages.

ii. Seasonal Support Drivers

50.     Seasonal Support Drivers also have performed other work off-the-clock, including training, completing work during mealtimes, and returning equipment after their last day of employment.

51.     For example, one worker was required to watch a safety video every single day before they clocked in.

52.      The time that Seasonal Support Drivers spend working off-the-clock is not consistently recorded, resulting in underpayment of wages.

III.    **UPS's Timekeeping Practices Under-Record Seasonal Delivery Workers' Compensable Hours.**

53.     UPS's timekeeping practices have in various ways under-recorded the actual number of hours worked by Seasonal Delivery Workers.

9

54.     UPS calculates payroll using either a Seasonal Delivery Worker's scheduled start time or their report to work time, whichever is later. UPS has, therefore, reduced compensable hours on any occasion on which a worker began working before the later time.

55.     UPS has automatically deducted meal breaks that were not taken.

56.     UPS has edited timekeeping so that Seasonal Delivery Workers are paid from the arrival of the Driver or the delivery of the first package until the delivery of the last package, irrespective of the time they actually spent working before the first delivery or after the last delivery.

**IV.     UPS Underpays Seasonal Delivery Workers.**

57.     As a result of the widespread off-the-clock work and time-shaving described above, the time that Seasonal Delivery Workers spend working is not consistently recorded, resulting in significant underpayment of wages.

58.     Seasonal workers across the state have complained to UPS managers on numerous occasions about their paychecks not reflecting all of their hours worked. Despite these complaints, UPS has persisted in the unlawful practices described above.

*A.  UPS fails to pay Seasonal Delivery Workers their promised wages.*

59.     As a result of these practices, UPS has routinely not paid Seasonal Delivery Workers their promised wages for each hour worked.

60.     For example, upon information and belief, in the week ending November 26, 2022, UPS promised one Seasonal Support Driver at a facility in Laurelton, New York a pay rate of $21 per hour. Upon information and belief, this Driver worked 27 hours, and UPS paid them $469, at least $98 less than what they were promised.

61.     In another example, upon information and belief, in the week ending December 30, 2023, UPS promised one Driver Helper at a facility in Maspeth, Queens, New York a pay rate of

$23 per hour. Upon information and belief, this Driver Helper worked 28.75 hours, and UPS paid them $576, at least $85 less than what they were promised.

62.    Upon information and belief, from October 2019[1] to January 2025, UPS failed to pay at least 27,700 Seasonal Delivery Workers their promised wages for each hour worked.

63.    Upon information and belief, from October 2019 to January 2025, UPS failed to pay promised wages at least 129,000 times.

B. *UPS fails to pay Seasonal Delivery Workers the state minimum wage.*

64.    As a result of these practices, UPS has routinely not paid Seasonal Delivery Workers the state minimum wage for each hour worked.

65.    For example, upon information and belief, in the week ending October 28, 2023, UPS promised one Driver Helper at a facility in Pelham Bay in the Bronx, New York a pay rate of $16.20 per hour. Upon information and belief, this Driver Helper worked 32.63 hours, and UPS paid them $450, $79 less than what they were promised and $39.45 less than the applicable state minimum wage of $15 per hour.

66.    Upon information and belief, from October 2019 to January 2025, UPS failed to pay at least 27,700 Seasonal Delivery Workers the state minimum wage for each hour worked.

67.    Upon information and belief, from October 2019 to January 2025, UPS failed to pay the state minimum wage at least 129,000 times.

C. *UPS fails to pay Seasonal Delivery Workers the federal minimum wage.*

68.    As a result of its practices, UPS sometimes underpays workers so significantly that their weekly wages fall below the federal minimum wage of $7.25 per hour.

---

[1] The Office of the Attorney General and UPS entered into tolling agreements that cumulatively extended the statutes of limitations for all claims by 109 days.

69. For example, upon information and belief, in the week starting December 18, 2022, one Seasonal Support Driver at a facility in Mt. Vernon, New York worked 2.5 hours. UPS paid this worker $7.12 for the entire week.

70. In another example, upon information and belief, in the week starting November 20, 2022, one Driver Helper at a facility in Mt. Vernon, New York worked 4.59 hours. UPS paid the worker $18.70 for the entire week.

71. Upon information and belief, from October 2019 to January 2025, UPS failed to pay at least 128 Seasonal Delivery Workers the federal minimum wage.

72. Upon information and belief, from October 2019 to January 2025, UPS failed to pay the federal minimum wage in at least 133 work weeks.

*D. UPS fails to pay Seasonal Delivery Workers for all time in excess of 40 weekly hours.*

73. When Seasonal Delivery Workers work over 40 hours in a week, UPS sometimes fails to pay for all of those hours over 40.

74. For example, upon information and belief, in the week ending December 14, 2019, one Driver Helper at a facility in Maspeth, Queens, New York worked 53.41 hours. Upon information and belief, UPS paid them for only 48.67 hours.

75. In another example, upon information and belief, in the week ending December 3, 2022, one Seasonal Support Driver at a facility in Laurelton, New York worked 47.02 hours. Upon information and belief, UPS paid them for only 41.65 hours.

76. In another example, upon information and belief, in the week ending December 16, 2023, one Driver Helper at a facility in Maspeth, Queens, New York worked 44.61 hours. Upon information and belief, UPS paid them for only 43.22 hours.

77.     In another example, upon information and belief, in the week ending December 2, 2023, one Seasonal Support Driver at a facility in Rome, New York worked 41.55 hours. Upon information and belief, UPS paid them for only 30.6 hours.

78.     Upon information and belief, from October 2019 to January 2025, UPS failed to pay at least 8,660 Seasonal Delivery Workers for hours worked over 40 hours in a week.

79.     Upon information and belief, from October 2019 to January 2025, UPS failed to pay for hours worked over 40 hours in a week at least 26,000 times.

**<u>CLAIMS FOR RELIEF</u>**

**<u>FIRST CAUSE OF ACTION</u>**

**<u>PURSUANT TO EXECUTIVE LAW § 63(12):</u>**
**<u>(Illegal Conduct—Unpaid Minimum Wage Under NYLL § 652, 12 N.Y.C.R.R. §§ 142-2.1)</u>**

80.     Plaintiff repeats and realleges paragraphs 1 through 79 as if fully set forth herein.

81.     Executive Law § 63(12) makes "repeated fraudulent or illegal acts or . . . persistent fraud or illegality in the carrying on, conducting or transaction of business" actionable by the Attorney General.

82.     At all relevant times, UPS has engaged in the carrying on, conducting, or transaction of business in New York within the meaning of Executive Law § 63(12).

83.     At all relevant times, Seasonal Delivery Workers have been UPS's employees, and UPS has been Seasonal Delivery Workers' employer, within the meaning of NYLL §§ 190 and 651.

84.     NYLL § 652 and 12 N.Y.C.R.R. § 142-2.1 specify minimum wage rates by year and region.

85.     UPS has required Seasonal Delivery Workers to perform work off-the-clock and without compensation.

13

86.     UPS's timekeeping practices have under-recorded Seasonal Delivery Workers' compensable hours.

87.     UPS has thus failed to pay Seasonal Delivery Workers the state minimum wage for each hour worked under 40 in a week, in violation of NYLL § 652 and 12 N.Y.C.R.R. § 142-2.1.

88.     UPS has failed to keep, make, preserve, maintain, and furnish accurate records of time worked by Seasonal Delivery Workers.

89.     UPS's violations of NYLL § 652 constitute repeated illegal acts and illegality in the carrying on, conducting, or transaction of business as defined by New York Executive Law § 63(12).

## SECOND CAUSE OF ACTION

### PURSUANT TO EXECUTIVE LAW § 63(12):
### (Illegal Conduct—Unpaid Promised Wages Under NYLL § 193)

90.     Plaintiff repeats and realleges paragraphs 1 through 89 as if fully set forth herein.

91.     Executive Law § 63(12) makes "repeated fraudulent or illegal acts or . . . persistent fraud or illegality in the carrying on, conducting or transaction of business" actionable by the Attorney General.

92.     At all relevant times, UPS has engaged in the carrying on, conducting, or transaction of business in New York within the meaning of Executive Law § 63(12).

93.     At all relevant times, Seasonal Delivery Workers have been UPS's employees, and UPS has been Seasonal Delivery Workers' employer, within the meaning of NYLL §§ 190 and 651.

94.     UPS has required Seasonal Delivery Workers to perform work off-the-clock and without compensation.

14

95.     UPS's timekeeping practices have under-recorded Seasonal Delivery Workers' compensable hours.

96.     UPS has thus failed to pay Seasonal Delivery Workers their promised wages for all hours worked, in violation of NYLL § 193.[2]

97.     UPS has failed to keep, make, preserve, maintain, and furnish accurate records of time worked by Seasonal Delivery Workers.

98.     UPS's violations of NYLL § 193 constitute repeated illegal acts and illegality in the carrying on, conducting, or transaction of business as defined by New York Executive Law § 63(12).

### THIRD CAUSE OF ACTION

### PURSUANT TO EXECUTIVE LAW § 63(12):
### (Illegal Conduct—Unpaid Overtime Under NYLL Article 19, 12 N.Y.C.R.R. § 142-2.2)

99.     Plaintiff repeats and realleges paragraphs 1 through 98 as if fully set forth herein.

100.    Executive Law § 63(12) makes "repeated fraudulent or illegal acts or . . . persistent fraud or illegality in the carrying on, conducting or transaction of business" actionable by the Attorney General.

101.    At all relevant times, UPS has engaged in the carrying on, conducting, or transaction of business in New York within the meaning of Executive Law § 63(12).

102.    At all relevant times, Seasonal Delivery Workers have been UPS's employees, and UPS has been Seasonal Delivery Workers' employer, within the meaning of NYLL §§ 190 and 651.

---

[2] The No Wage Theft Loophole Prevention Act, effective as of August 2021, clarified that NYLL § 193 has always required full payment of wages at the agreed-upon rate for all hours worked.

103. Under NYLL Article 19 and 12 N.Y.C.R.R. § 142-2.2, an employer must compensate weekly hours over 40 at a wage rate of one and one-half times the employee's regular rate.

104. Seasonal Delivery Workers at times have worked more than 40 weekly hours.

105. UPS has required Seasonal Delivery Workers to perform work off-the-clock and without compensation, including in weeks in which Seasonal Delivery Workers worked more than 40 hours.

106. UPS's timekeeping practices have under-recorded Seasonal Delivery Workers' compensable hours.

107. UPS has thus failed to pay Seasonal Delivery Workers at a rate of one and one-half times their regular rates of pay for all weekly hours worked over 40, in violation of 12 N.Y.C.R.R. § 142-2.2.

108. UPS has failed to keep, make, preserve, maintain, and furnish accurate records of time worked by Seasonal Delivery Workers.

109. UPS's violations of NYLL 12 N.Y.C.R.R. § 142-2.2 constitute repeated illegal acts and illegality in the carrying on, conducting, or transaction of business as defined by New York Executive Law § 63(12).

## FOURTH CAUSE OF ACTION

### PURSUANT TO EXECUTIVE LAW § 63(12):
### (Illegal Conduct—Unpaid Minimum Wage Under the FLSA, 29 U.S.C. § 206(a))

110. Plaintiff repeats and realleges paragraphs 1 through 109 as if fully set forth herein.

111. Executive Law § 63(12) makes "repeated fraudulent or illegal acts or . . . persistent fraud or illegality in the carrying on, conducting or transaction of business" actionable by the Attorney General.

112.    At all relevant times, UPS has engaged in the carrying on, conducting, or transaction of business in New York within the meaning of Executive Law § 63(12).

113.    At all relevant times, Seasonal Delivery Workers have been UPS's employees, and UPS has been Seasonal Delivery Workers' employer, within the meaning of the FLSA, 29 U.S.C. § 203.

114.    At all relevant times, UPS has been engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. § 206(a).

115.    Under 29 U.S.C. § 206(a), an employer must compensate weekly hours up to 40 at a minimum wage of $7.25 per hour.

116.    UPS has required Seasonal Delivery Workers to perform work off-the-clock and without compensation.

117.    UPS's timekeeping practices have under-recorded Seasonal Delivery Workers' compensable hours.

118.    UPS has thus failed to pay Seasonal Delivery Workers the federal minimum wage for all weekly hours worked under 40, in violation of 29 U.S.C. § 206(a).

119.    UPS has failed to keep, make, preserve, maintain, and furnish accurate records of time worked by Seasonal Delivery Workers.

120.    UPS's violations of the FLSA have been willful within the meaning of 29 U.S.C. § 255.

121.    UPS's violations of 29 U.S.C. § 206(a) constitute repeated illegal acts and illegality in the carrying on, conducting, or transaction of business as defined by New York Executive Law § 63(12).

## FIFTH CAUSE OF ACTION

### PURSUANT TO EXECUTIVE LAW § 63(12):
### (Illegal Conduct—Unpaid Overtime Under the FLSA, 29 U.S.C. § 207(a))

122.    Plaintiff repeats and realleges paragraphs 1 through 121 as if fully set forth herein.

123.    Executive Law § 63(12) makes "repeated fraudulent or illegal acts or . . . persistent fraud or illegality in the carrying on, conducting or transaction of business" actionable by the Attorney General.

124.    At all relevant times, UPS has engaged in the carrying on, conducting, or transaction of business in New York within the meaning of Executive Law § 63(12).

125.    At all relevant times, Seasonal Delivery Workers have been UPS's employees, and UPS has been Seasonal Delivery Workers' employer, within the meaning of the FLSA, 29 U.S.C. § 203.

126.    At all relevant times, UPS has been engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. § 207(a).

127.    Under 29 U.S.C. § 207(a), an employer must compensate weekly hours over 40 at a wage rate of one and one-half times the employee's regular rate.

128.    Seasonal Delivery Workers at times have worked more than 40 weekly hours.

129.    UPS has required Seasonal Delivery Workers to perform work off-the-clock and without compensation, including in weeks in which Seasonal Delivery Workers worked more than 40 hours.

130.    UPS's timekeeping practices have under-recorded Seasonal Delivery Workers' compensable hours.

18

131.    UPS has thus failed to pay Seasonal Delivery Workers at a rate of one and one-half times their regular rates of pay for all weekly hours worked over 40, in violation of 29 U.S.C. § 207(a).

132.    UPS has failed to keep, make, preserve, maintain, and furnish accurate records of time worked by Seasonal Delivery Workers.

133.    UPS's violations of the FLSA have been willful within the meaning of 29 U.S.C. § 255.

134.    UPS's violations of 29 U.S.C. § 207(a) constitute repeated illegal acts and illegality in the carrying on, conducting, or transaction of business as defined by New York Executive Law § 63(12).

## SIXTH CAUSE OF ACTION

### PURSUANT TO EXECUTIVE LAW § 63(12):
### (Illegal Conduct—Inaccurate Wage Statements Under NYLL § 195(3))

135.    Plaintiff repeats and realleges paragraphs 1 through 134 as if fully set forth herein.

136.    Executive Law § 63(12) makes "repeated fraudulent or illegal acts or . . . persistent fraud or illegality in the carrying on, conducting or transaction of business" actionable by the Attorney General.

137.    At all relevant times, UPS has engaged in the carrying on, conducting, or transaction of business in New York within the meaning of Executive Law § 63(12).

138.    At all relevant times, Seasonal Delivery Workers have been UPS's employees, and UPS has been Seasonal Delivery Workers' employer, within the meaning of NYLL §§ 190 and 651.

139.    NYLL § 195(3) provides, in relevant part, that an employer must "furnish each employee with a statement with every payment of wages, listing . . . the number of regular hours worked[] and the number of overtime hours worked."

140.    UPS has required Seasonal Delivery Workers to perform work off-the-clock.

141.    UPS's timekeeping practices have under-recorded Seasonal Delivery Workers' compensable hours.

142.    Accordingly, the wage statements UPS provided to Seasonal Delivery Workers inaccurately stated their regular and overtime hours worked.

143.    UPS's violations of NYLL § 195(3) constitute repeated illegal acts and illegality in the carrying on, conducting, or transaction of business as defined by New York Executive Law § 63(12).

## SEVENTH CAUSE OF ACTION

### PURSUANT TO EXECUTIVE LAW § 63(12):
### (Illegal Conduct—Inaccurate Payroll Records Under NYLL § 195(4))

144.    Plaintiff repeats and realleges paragraphs 1 through 143 as if fully set forth herein.

145.    Executive Law § 63(12) makes "repeated fraudulent or illegal acts or . . . persistent fraud or illegality in the carrying on, conducting or transaction of business" actionable by the Attorney General.

146.    At all relevant times, UPS has engaged in the carrying on, conducting, or transaction of business in New York within the meaning of Executive Law § 63(12).

147.    At all relevant times, Seasonal Delivery Workers have been UPS's employees, and UPS has been Seasonal Delivery Workers' employer, within the meaning of NYLL §§ 190 and 651.

148.    NYLL § 195(4) provides, in relevant part, that an employer must "establish, maintain, and preserve…contemporaneous, true, and accurate payroll records showing for each week worked the hours worked…and the number of overtime hours worked."

149.    UPS has required Seasonal Delivery Workers to perform work off-the-clock.

150.    UPS's timekeeping practices have under-recorded Seasonal Delivery Workers' compensable hours.

151.    Accordingly, UPS's payroll records inaccurately stated their regular and overtime hours worked.

152.    UPS's violations of NYLL § 195(4) constitute repeated illegal acts and illegality in the carrying on, conducting, or transaction of business as defined by New York Executive Law § 63(12).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the Attorney General of the State of New York, on behalf of the People of the State of New York, requests that this Court issue an Order for the following relief:

(a) Finding that UPS repeatedly violated NYLL § 193;

(b) Finding that UPS repeatedly violated NYLL §§ 195(3) and (4);

(c) Finding that UPS repeatedly violated NYLL § 652 and 12 N.Y.C.R.R. § 142-2.1;

(d) Finding that UPS repeatedly violated 12 N.Y.C.R.R. § 142-2.2;

(e) Finding that UPS repeatedly violated 29 U.S.C. § 206(a);

(f) Finding that UPS repeatedly violated 29 U.S.C. § 207(a);

(g) Enjoining UPS from engaging in unlawful practices which deprive Seasonal Delivery Workers of the minimum wage, promised wages, and overtime wages under 29 U.S.C. §§ 206(a), 207(a), NYLL §§ 193, 652, and 12 N.Y.C.R.R. §§ 142-2.1-2.2, which deprive

Seasonal Delivery Workers of accurate wage statements as required by NYLL § 195(3), and which lead to the maintenance of inaccurate payroll records in violation of NYLL § 195(4);

(h) Awarding Plaintiff disgorgement, restitution, damages, liquidated damages, and penalties under Executive Law § 63(12) and NYLL § 198 for violations of NYLL § 193;

(i) Awarding Plaintiff disgorgement, restitution, damages, liquidated damages, and penalties under Executive Law § 63(12) and NYLL § 198 for violations of NYLL §§ 195(3) and (4);

(j) Awarding Plaintiff disgorgement, restitution, damages, liquidated damages, and penalties under Executive Law § 63(12) and 29 U.S.C. § 216(b) for violations of 29 U.S.C. § 206(a);

(k) Awarding Plaintiff disgorgement, restitution, damages, liquidated damages, and penalties under Executive Law § 63(12) and 29 U.S.C. § 216(b) for violations of 29 U.S.C. § 207(a);

(l) Awarding Plaintiff disgorgement, restitution, damages, liquidated damages, and penalties under Executive Law § 63(12) and NYLL § 198 for violations of NYLL § 652 and 12 N.Y.C.R.R. § 142-2.1;

(m) Awarding Plaintiff disgorgement, restitution, damages, liquidated damages, and penalties under Executive Law § 63(12) and NYLL § 198 for violations of 12 N.Y.C.R.R. § 142-2.2;

(n) Awarding prejudgment interest;

(o) Awarding Plaintiff reasonable attorneys' fees, costs, and expenses;

(p) Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff, the Attorney General of the State of New York, on behalf of the People of the State of New York, demands a trial by jury.

22

Dated: New York, New York
March 20, 2026

Respectfully submitted,

LETITIA JAMES
Attorney General of the State of New York
Office of the New York State Attorney General
28 Liberty Street, 20th Floor
New York, New York 10005

KAREN CACACE, *Chief of Labor Bureau*
YOUNG LEE, *Deputy Chief of Labor Bureau*
FIONA KAYE, *Civil Enforcement Section Chief*

By: */s/ Julio Sharp-Wasserman*
JESSICA AGARWAL, *Assistant Attorney General*
ANASTASIA ERIKSSON, *Assistant Attorney General*
JULIO SHARP-WASSERMAN, *Assistant Attorney General*
Jessica.Agarwal@ag.ny.gov
Anastasia.Eriksson@ag.ny.gov
Julio.Sharp-Wasserman@ag.ny.gov